UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

PRIORITY SEND

CIVIL MINUTES -- GENERAL

Case No.  **CV 04-7690-JFW (PLAx)**                           Date: June 28, 2005

Title:   MARK BETHEA, et al. -v- MARK BURNETT, et al.  THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

**PRESENT:**
HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

Shannon Reilly                                    None Present
Courtroom Deputy                                  Court Reporter

**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
None                                              None

**PROCEEDINGS (IN CHAMBERS):**   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [filed 5/6/05; Docket No. 73];

ORDER DISMISSING PLAINTIFFS' SECOND, THIRD, AND FIFTH CLAIMS FOR RELIEF WITHOUT PREJUDICE;

ORDER DENYING DEFENDANT CONRAD RIGGS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR BREACH OF IMPLIED-IN-FACT CONTRACT AND BREACH OF CONFIDENCE AS MOOT [filed 5/6/05; Docket No. 72]



On May 6, 2005, Defendants Mark Burnett, Mark Burnett Productions, Inc., JMBP, Inc., Trump Productions, LLC, Donald Trump, NBC Universal, Conrad Riggs and Jay Bienstock (collectively "Defendants") filed a Motion for Summary Judgment on Plaintiffs' First, Fourth and Fifth Claims for Relief.  On May 6, 2005, Defendant Conrad Riggs filed a Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment on Plaintiffs' Claims for Breach of Implied-In-Fact Contract and Breach of Confidence.[1]  On June 7, 2005, Plaintiffs Mark Bethea and

---

[1] On May 10, 2005, Defendants and Defendant Conrad Riggs each filed an Amended Notice of Motion for Summary Judgment, and on May 31, 2005, each filed a Corrected Memorandum of Points and Authorities in support of their respective Motions.

Velocity Entertainment Group (collectively "Plaintiffs") filed their Opposition to Defendants' Motions. On June 13, 2005, Defendants filed a Consolidated Reply in support of their Motions.

The Motions came regularly for hearing on June 20, 2005. After hearing oral argument on the Motions, the Court took the matters under submission. After reviewing the moving, opposing, and reply papers and hearing oral argument, the Court rules as follows:

## I. Factual Background

### A. The Creation of C.E.O.

In August of 2000, Plaintiff Mark Bethea ("Plaintiff") conceived of and drafted a treatment for a reality television program entitled C.E.O. On August 30, 2000, Plaintiff registered his treatment for C.E.O. with the Writer's Guild of America. In late 2000 and early 2001, Plaintiff prepared a PowerPoint presentation illustrating his reality television program concept: C.E.O.[2] During that same period, Plaintiff also drafted treatments for two other reality television program concepts entitled Speed Demons and Air Combat.

Plaintiff, a graduate of the United States Air Force Academy and a former fighter pilot, has worked in the private jet industry since 1996. In the spring of 2001, Plaintiff met Alan Preston through a friend who worked in the aviation office at the Santa Monica Airport. Mr. Preston was employed in the field of international business manufacturing and aviation, "had access to vintage military fighter aircraft" and was "fairly well known for flying those kinds of airplanes." In the course of his initial conversation with Mr. Preston, Plaintiff mentioned that he was working on a concept for a television program about air combat. Mr. Preston was interested in the concept and thought he could assist Plaintiff with the program. Specifically, Mr. Preston was interested in working as an aerial coordinator for the program. Mr. Preston offered to arrange a meeting for Plaintiff to "pitch" Air Combat to Defendant Conrad Riggs, an attorney who is primarily responsible for Defendant Mark Burnett's business affairs. Mr. Preston then contacted Mr. Riggs and told him about Plaintiff's concept for an "airplane show." Mr. Riggs agreed to meet with Plaintiff.

On June 11, 2001, Plaintiff met with Mr. Riggs and Mr. Preston to pitch his reality television concepts to Mr. Riggs. Plaintiff alleges that during the June 11, 2001 meeting, he discussed his reality television concepts Air Combat and Speed Demon with Mr. Riggs. Plaintiff also claims that he briefly described his concept for C.E.O. to Mr Riggs. Although Plaintiff did not play his PowerPoint presentation for C.E.O. during that meeting, he left a CD-Rom which contained the presentation along with a copy of his treatment for C.E.O. with Mr. Riggs with the "expectation" that Mr. Riggs would review them at a later time.

In the months following the June 11, 2001 meeting, Plaintiff and Mr. Riggs continued to discuss Plaintiff's concept for Air Combat. They had a second meeting on July 13, 2001 to discuss possible revisions to Air Combat. Plaintiff's concept for C.E.O. was not discussed at this second meeting. Plaintiff alleges that he discussed C.E.O. with Mr. Riggs on July 25, 2001 during

---

[2] On April 16, 2004, Plaintiff registered his treatment and PowerPoint presentation for C.E.O. with the United States Copyright Office.

an "unscheduled meeting" at Mr. Riggs' office. Plaintiff also claims that he discussed *C.E.O.* with Mr. Riggs during at least one telephone conversation. On August 13, 2001, Mr. Riggs informed Plaintiff that he was not interested in pursing *Air Combat*. August 13, 2001 was the last time Plaintiff spoke with Mr. Riggs.

### B. The Creation of *The Apprentice*

In late 2002, while filming *Survivor: The Amazon* in Brazil,[3] Defendant Mark Burnett first conceived of the idea for the reality television program *The Apprentice*. After watching a BBC program entitled *Trouble at the Top*, Mr. Burnett became interested in exploring the possibility of creating a *Survivor*-type program set in the "concrete jungle" of New York City. The program would follow a group of contestants competing or "interviewing" for a position as the apprentice to a well known business mogul. Mr. Burnett had met Defendant Donald Trump in New York City on May 13, 2002 during the filming of the live finale for *Survivor: The Marquesas* which was held at Trump Wollman Rink and believed that Mr. Trump would be a perfect candidate for the role as the business mogul. Mr. Burnett also believed from watching a segment on *Access Hollywood* that Mr. Trump might be interested in accepting a role on a reality television program.

Upon returning from Brazil, Mr. Burnett discussed his concept for *The Apprentice* with Mr. Riggs. Mr. Riggs suggested that Mr. Burnett hire Ted Smith to further develop the idea for *The Apprentice*. Mr. Burnett and Mr. Riggs met with Mr. Smith on January 14, 2003 to discuss Mr. Burnett's concept for a "*Survivor* in the city." During that meeting, Mr. Burnett gave Mr. Smith a copy of the treatment for *Survivor* which Mr. Smith was to use as a "blueprint" for creating the treatment for *The Apprentice*. On February 2, 2003, Mr. Burnett met with Mr. Trump to discuss whether Mr. Trump would be interested in starring as the business mogul on *The Apprentice*. Mr. Trump immediately agreed to participate in the project. Mr. Burnett signed a deal for *The Apprentice* with NBC in March of 2003, and on January 8, 2004, the first episode of *The Apprentice* aired on the NBC network.

On September 15, 2004, Plaintiffs filed a Complaint against Defendants alleging the following five claims for relief: (1) Copyright infringement against all Defendants; (2) Breach of implied-in-fact contract against Defendant Conrad Riggs; (3) Breach of confidence against Defendant Conrad Riggs; (4) Unfair competition against all Defendants; and (5) Accounting against all Defendants. In their Complaint, Plaintiffs claim that Defendants infringed Plaintiff Bethea's copyright in his treatment and PowerPoint presentation for *C.E.O.* with the creation and production of the network television series *The Apprentice*.

## II. Legal Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A party opposing

---

[3] *Survivor* first debuted on the CBS network in March of 2000.

a properly made and supported motion for summary judgment may not rest upon mere denials but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."). In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case." American International Group, Inc. v. American International Bank, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. "This requires evidence, not speculation." Meade v. Cedarapids, Inc., 164 F.3d 1218, 1225 (9th Cir. 1999). The Court must assume the truth of direct evidence set forth by the opposing party. See Hanon v. Dataproducts Corp. 976 F.2d 497, 507 (9th Cir. 1992). However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. See Anderson, 477 U.S. at 249-50; TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631-32 (9th Cir. 1987). Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." American International Group, 926 F.2d at 836-37. In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997).

## III. Discussion

### A. Defendants' Motion for Summary Judgment on Plaintiffs' First Claim for Relief for Copyright Infringement

To prove copyright infringement, Plaintiffs must prove: (1) ownership of a valid copyright in C.E.O. and (2) that Defendants copied elements of C.E.O. protected by that copyright. See, e.g., Pasillas v. McDonald's Corp., 927 F.2d 440, 442 (9th Cir. 1991); Three Boys Music Corp. v. Bolton, 212 F.3d 477, 481 (9th Cir. 2000). Since direct evidence of copying is rarely available and copying can therefore be difficult to prove, Plaintiffs "may establish copying by showing (1) circumstantial evidence of access to the protected work and (2) substantial similarity of 'ideas' and 'expression' between the copyrighted work and the allegedly infringing work." Jason v. Fonda, 526 F. Supp. 774, 776 (C.D. Cal. 1981), aff'd, 698 F.2d 966 (9th Cir. 1982); see also Three Boys Music, 212 F.3d at 481 ("Absent direct evidence of copying, proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'").

Defendants move for summary judgment on Plaintiffs' First Claim for Relief on the grounds that, as a matter of law, Plaintiffs cannot establish that Defendants had access to C.E.O., or that

*The Apprentice* is substantially similar to *C.E.O.*[4] Defendants further argue that "[r]egardless of whether the Court determines that there are genuine issues of fact precluding summary judgment on access or substantial similarity," summary judgment is still warranted on the grounds that *The Apprentice* was independently conceived by Mark Burnett in 2002 while in Brazil filming the 2003 season of *Survivor: The Amazon*." Defendants' Motion at 23. Plaintiffs claim that there are genuine issues of material fact with respect to whether Defendants had access to *C.E.O.* and whether *C.E.O.* and *The Apprentice* are substantially similar. Plaintiffs also dispute that *The Apprentice* was independently created by Mr. Burnett.

In deciding Defendants' Motion for Summary Judgment, the Court has reviewed the parties' papers, expert declaration and/or report, and supporting declarations and evidence. Specifically, the Court has read the treatment for *C.E.O.* and watched the PowerPoint presentation for *C.E.O.* The Court has also watched every episode of the first and second seasons of *The Apprentice*. See *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) ("Before considering a motion for summary judgment on the issue of substantial similarity, the court must make a detailed comparison of the allegedly infringing and infringed works.").

### 1. There is a Genuine Issue of Material Fact with Respect to Access

"Proof of access requires 'an opportunity to view or to copy plaintiff's work.'" *Three Boys Music*, 212 F.3d at 482 (quoting *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977)). "Opportunity" has been defined as a "reasonable" possibility that Defendants viewed the treatment or PowerPoint presentation for *C.E.O.* *Id.; see also Jason*, 526 F. Supp. at 776-77. "[A] bare possibility is insufficient to create a genuine issue of whether defendants copied plaintiff's [work]." *Id.* at 777. Since Plaintiffs have not provided the Court with any direct evidence that Defendants had access to *C.E.O.* when *The Apprentice* was created, Plaintiffs must rely on circumstantial evidence to prove access. "Circumstantial evidence of reasonable access is proven in one of two ways: (1) a particular chain of events is established between the plaintiff's work and the defendant's access to that work (such as through deals with a publisher or record company), or (2) the plaintiff's work has been widely disseminated." *Three Boys Music*, 212 F.3d at 482.

Plaintiffs claim that Defendants had access to *C.E.O.* because Plaintiff Bethea gave Mr. Riggs a copy of the treatment and PowerPoint presentation for *C.E.O.* during the June 11, 2001 meeting. In support of their claim, Plaintiffs submit the declaration of Plaintiff Bethea, in which he states that he "pitched all three of [his] shows, 'C.E.O.,' 'Air Combat' and 'Speed Demons' to Conrad Riggs" during the meeting on June 11, 2001. Decl. of M. Bethea at ¶ 41. Plaintiff further states that he "decided not to show [Mr. Riggs] the 'C.E.O.' PowerPoint presentation" at that time, and "explained to Mr. Riggs that [he] would leave the PowerPoint presentation with Mr. Riggs" to watch "at his convenience." *Id.* Plaintiff also claims that he "briefly described" his concept for *C.E.O.* to Mr. Riggs, but did not go "into elaborate detail" because he "expected that Mr. Riggs would watch the PowerPoint presentation." *Id.* at ¶ 42.

---

[4] Defendants do not contest that Plaintiff Mark Bethea owns a valid copyright in his treatment and PowerPoint presentation for *C.E.O.*

Defendants dispute that Plaintiff gave Mr. Riggs a copy of the treatment and PowerPoint presentation for *C.E.O.* at the June 11, 2001 meeting and further claim that Plaintiff never "pitched" or otherwise mentioned the concept of *C.E.O.* to Mr. Riggs or any of the other Defendants in this action at any time. Indeed, Defendant Riggs, Defendant Burnett, Defendant Trump, Mr. Smith and Mr. Preston each categorically deny having any knowledge of Plaintiff Bethea's concept for *C.E.O.* prior to Plaintiffs filing this lawsuit.

In his declaration, Mr. Riggs states that "[d]uring the meeting in June 2001, Mr. Bethea pitched to me ideas for two reality shows, 'Air Combat' and 'Speed Demons.'" Decl. of C. Riggs at ¶ 4. Mr. Riggs claims that those "were the only shows that [Plaintiff] pitched to me at this, or any other, time." *Id.* Mr. Riggs further states that "Mr. Bethea did not pitch or present any information or materials pertaining to 'CEO' to me at any time before, during or after [the June 11, 2001] meeting, nor did [Plaintiff] provide me any materials pertaining to any other reality show set in a corporate environment." *Id.* Mr. Riggs is clear that he "never discussed 'CEO' or any related idea with Mr. Bethea at any time. Further, [he has] never seen the treatment for 'CEO' and [has] only flipped through several pages of a print-out of the CD-ROM of 'CEO' after it was produced by Plaintiffs in discovery in this action." *Id.* at ¶ 5.

In his declaration, Mark Burnett states that "[u]ntil Plaintiffs' attorneys began sending letters to Mr. Riggs in mid-2003, after production on *The Apprentice* had already begun, I had never heard of Mark Bethea, and never heard of 'CEO.' I have never read the treatment for 'CEO,' and I have never watched any PowerPoint slideshow about 'CEO.'" Decl. of M. Burnett at ¶ 11. Mr. Smith also confirms in his declaration, that prior to Plaintiffs filing this lawsuit, he had never heard of Mark Bethea or *C.E.O.*, had not read the treatment for *C.E.O.* and had not seen the PowerPoint presentation for *CEO*. *See* Decl. of T. Smith at ¶ 15.

During his deposition, Donald Trump testified that he had neither seen nor heard of Plaintiff's PowerPoint presentation for *C.E.O.* *See* Trump Dep. at 7:11-20. Alan Preston, the only other individual present at the first meeting between Plaintiff and Mr. Riggs, testified during his deposition that Plaintiff did not say anything about *C.E.O.* or a reality television show set in a corporate setting during the June 11, 2001 meeting. *See* Preston Dep. at 112:17-23. Mr. Preston further testified that he did not witness Plaintiff give Mr. Riggs a treatment or PowerPoint presentation for *C.E.O.* at that meeting. *See id.* at 112:24-114:3.

Notwithstanding this clear factual dispute, Defendants move for summary judgment on the issue of access. Defendants argue that the Court should disregard Plaintiff Bethea's "self-serving declaration" regarding the details of the June 11, 2001 meeting because Plaintiffs refused to provide that information to Defendants during discovery. Specifically, Defendants claim that "[t]hroughout discovery, Bethea [ ] consistently refused to respond to discovery regarding the background or the details of the June 11, 2001 meeting" and therefore Plaintiffs should not be permitted to use information regarding his "pitch" at the June 11, 2001 meeting in his Opposition to Defendants' Motion pursuant to Federal Rule of Civil Procedure 37(c). Defendants' Motion at 11.

Rule 37(c) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c). Defendants argue that the following excerpt from Plaintiff Bethea's deposition is an example of Plaintiffs' refusal to disclose information required by Rule 26(a):

> By Mr. Marenberg [Defendants' Counsel]:
> Q. What was said at the [June 11, 2001] meeting?
> Mr. Markarem [Plaintiffs' Counsel]: Objection. Overbroad.
> By Mr. Marenberg:
> Q. In as much detail as you can give.
> Mr. Markarem: Objection. Overbroad. Calls for a narrative. I'll instruct him not to answer. If you break it down, it will be helpful for us.
> Mr. Marenberg: Let's take a five-minute break.

Bethea Dep. at 113:25-114:17. After the short break, Defendants' counsel abandoned the question regarding the June 11, 2001 meeting and instead chose to question Plaintiff on another subject. *See, e.g., id.* at 114:15-22.

Defendants also cite Plaintiffs' response to one of Defendant Riggs' interrogatories as a further example of Plaintiffs' "failure" to provide Defendants with discovery. With respect to the June 11, 2001 meeting, Defendant Riggs' Interrogatory No. 3 asked Plaintiffs to "set forth in detail the purpose of the meeting, the attendees of the meeting, the location of the meeting, and the date of the meeting." *See* Decl. of P. Kelly at Ex. J, pp. 4-5. Plaintiffs objected to the interrogatory and did not otherwise respond to the discovery request. *See id.* During the June 20, 2005 hearing, Defendants' counsel argued that the foregoing examples evidence a "pattern" of Plaintiffs' attempts to prevent Defendants from obtaining key discovery in this case, and that without responses to the foregoing discovery requests, there is no testimony in the record as to the substance of what was allegedly "pitched" to Mr. Riggs at the June 11, 2001 meeting.

Having reviewed Plaintiff's deposition and Plaintiffs' discovery responses which were provided to the Court by Defendants, the Court finds that Plaintiffs did not prevent Defendants from obtaining discovery or otherwise "fail to disclose information required by Rule 26(a)." Specifically, the Court finds that Defendants were given ample discovery regarding Plaintiff Bethea's "pitch" of *C.E.O.* to Defendant Riggs. For example, in response to Defendant JMBP, Inc.'s Interrogatory No. 1: "State all facts supporting your contention that '[i]n the summer of 2001, Bethea pitched his original idea [for *C.E.O.*] to defendants,'" Plaintiffs responded that "[d]uring the meeting, Bethea pitched 'C.E.O.' to Riggs and gave Riggs a treatment for 'C.E.O.' along with a CD-Rom containing a PowerPoint presentation for 'C.E.O.'" *See* Decl. of P. Kelly at Ex. G, p. 4. Moreover, during his deposition, Plaintiff testified that he "discussed" *C.E.O.* with Mr. Riggs at the June 11, 2005 meeting, discussed it again at the "unscheduled meeting in late July," and "discussed it on several occasions on the telephone." Bethea Dep. at 90:24-91:3. Plaintiff also testified that he asked Mr. Riggs during a telephone conversation whether "he had had a chance to watch the PowerPoint presentation," to which Mr. Riggs responded that he had watched the presentation "but he didn't really want to talk about that right now." *Id.* at 128:7-19.

At the very least, Defendants were provided with discovery regarding Plaintiffs' contention that Plaintiff Bethea gave the treatment and PowerPoint presentation for *C.E.O.* to Mr. Riggs during the June 11, 2001 meeting, a fact which is set forth in Plaintiff's declaration and which, by itself, would be sufficient evidence to raise a genuine issue of material fact on the element of access. Accordingly, the Court denies Defendants' request to strike Plaintiff Bethea's declaration. In their Reply, "Defendants acknowledge that *if* the Court determines that [Plaintiff] Bethea's testimony is admissible for purposes of this motion, there exists a genuine issue of fact on access." Reply at 3-4 (emphasis in original). In light of the Court's finding that Plaintiff Bethea's

declaration is admissible, and based upon Defendants' concession in their papers and at the hearing that Plaintiff Bethea's declaration raises a genuine of material fact, the Court finds that there is a genuine issue of fact which precludes summary judgment on the issue of access.[5]

    2.    <u>No Reasonable Juror Could Find that *C.E.O.* and *The Apprentice* are Substantially Similar</u>

Even if the Court were to find that Defendants had access to *C.E.O.*, to prove copying Plaintiffs must also demonstrate that the copyrighted work and the allegedly infringing work are substantially similar. *See Three Boys Music*, 212 F.3d at 481. "'Substantial similarity' refers to similarity of expression, not merely similarity of ideas or concepts." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1398 (9th Cir. 1997). Only protected expression is relevant for purposes of assessing substantial similarity. *See Shaw v. Lindheim*, 919 F.2d 1353, 1361 (9th Cir. 1990); *see also Smart Inventions, Inc. v. Allied Communications Corp.*, 94 F. Supp. 2d 1060, 1066 (C.D. Cal. 2000) ("It is an axiom of copyright law that ideas are not protected."). "[T]he party claiming infringement may place '*no* reliance upon any similarity in expression resulting from' unprotectable elements." *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994) (quoting *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987)) (emphasis in original).

To determine whether two works are substantially similar, the Ninth Circuit employs a two-part analysis - an extrinsic and an intrinsic test.[6] "The 'extrinsic test' is an objective comparison of specific expressive elements" which "'focuses on articulable similarities'" between the two works. *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)). "The intrinsic test is a subjective test that focuses on whether the ordinary, reasonable audience would recognize the [Defendants'] work as a dramatization or picturization of the [P]laintiff's work." *Kouf*, 16 F.3d at 1045 (internal quotations omitted). "For summary judgment, only the extrinsic test is important." *Id.* "[A] plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Id.*

---

[5] The Court recognizes that the Ninth Circuit requires "a lower standard of proof of substantial similarity when a high degree of access is shown." *Three Boys Music*, 212 F.3d at 485. However, the Court need not address the application of the "inverse ratio rule" to this case, as Plaintiffs failed to raise that argument in their Opposition to Defendants' Motion.

[6] "[O]riginally . . . the extrinsic prong was a test of similarity of ideas based on external criteria; analytic dissection and expert testimony could be used, if helpful. The intrinsic prong was a test for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance. As it has evolved, however, the extrinsic test now objectively considers where there are substantial similarities in *both* ideas and expression, whereas the intrinsic test continues to measure expression subjectively." *Apple Computer*, 35 F.3d at 1442. "Because the criteria incorporated into the extrinsic test encompasses all objective manifestations of creativity, the two tests are more sensibly described as objective and subjective analyses of expression, having strayed from *Krofft's* division between expression and ideas." *Shaw*, 919 F.2d at 1357.

The Court recognizes that summary judgment is not highly favored on questions of substantial similarity in copyright cases. *See e.g., Shaw*, 919 F.2d at 1355. Summary judgment is only appropriate if "no reasonable juror could find substantial similarity of ideas and expression, viewing the evidence in the light most favorable to the nonmoving party." *Kouf*, 16 F.3d at 1045; *see also Pasillas*, 927 F.2d at 442 ("Our circuit has expressed a certain disfavor for summary judgment on questions of substantial similarity, but it is nevertheless appropriate to grant summary judgment if, considering the evidence and drawing all inferences from it in the light most favorable to the nonmoving party, no reasonable jury could find that the works are substantially similar in idea and expression."). Although summary judgment is generally disfavored on the question of substantial similarity, "summary judgment is proper when the Court determines that the similarity between works is insubstantial as a matter of law." *Jason*, 526 F. Supp. at 777. Indeed, the Ninth Circuit has "frequently . . . affirmed summary judgment in favor of copyright defendants on the issue of substantial similarity." *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989).

After reading the treatment for *C.E.O.*, watching the PowerPoint presentation for *C.E.O.*, and watching each episode of the first and second seasons of *The Apprentice*, and upon review of the papers submitted by the parties as well as the declarations and/or reports of the parties' experts, the Court finds that, as a matter of law, the two works are not substantially similar.

*C.E.O.* is a concept for a reality television program in which an unknown number of contestants are chosen to form a start-up corporation and compete each week to move "up the corporate ladder" with the winner of the competition to be named as the CEO of the start-up corporation. At the outset of the program, the contestants live together in identical living quarters, and they all work together from 9:00 a.m. to 5:00 p.m. in a single office space adjacent to their living space. The contestants compete each week in business challenges which directly relate to the development or growth of the start-up corporation. Examples of business tasks include screening, hiring and disciplining employees of the start-up corporation, and reviewing budgets, making purchasing recommendations, and creating advertising campaigns for the start-up corporation. The game also includes "wildcards" which are given to a contestant and "contain surprise perks or penalties to be enjoyed or endured by that contestant." These wildcards also relate to the functioning and environment of the start-up corporation.

At the conclusion of each task, the contestants are individually evaluated and scored by a "board of directors" comprised of business leaders and college professors. The highest scoring contestants will move "up the corporate ladder" and be rewarded with improved office space, living accommodations, meals and benefits, while the lowest scoring contestants will move "down the corporate ladder" and be given less luxurious meals, work and living spaces. Contestants are not eliminated from the competition. At the conclusion of the competition, the two top scoring contestants will lead teams of the remaining contestants in a task which will determine which contestant will be named CEO of the start-up corporation.

*The Apprentice* is a reality television program in which sixteen to eighteen contestants compete in a thirteen to fifteen week job "interview" for a position as Donald Trump's apprentice. All of the contestants live together in a luxurious "suite" in Trump Tower in New York City. At the outset of the program, the contestants are divided into two teams. In the first two seasons of *The Apprentice*, the teams were divided by gender. Each week, the teams are given a business task which they have a limited amount of time to complete. Immediately after learning the nature of the task, the teams are each required to pick a team member to act as "project manager." The project

manager is responsible for leading the team in the task for that week, and the project manager of the losing team is held at least partially responsible for the team's loss. The tasks range from selling lemonade on the streets of New York City, to developing an advertising campaign for Marquis Jet Corporation, to managing a Planet Hollywood restaurant for an evening, to renovating an apartment to lease. Two of Mr. Trump's employees, usually George Ross and Carolyn Kepcher, watch the teams as they complete the task, and then advise Mr. Trump on the teams' respective performances on the task.

At the conclusion of each task, one team is named the "winner" of the task based on their performance during that task. The winning team is then given a reward which can range from a tour of Donald Trump's residence, to dinner at an expensive New York restaurant, to meeting George Steinbrenner, to a trip on Mr. Trump's jet to his Mar-a-lago club on his estate in Florida. The losing team each week must meet Mr. Trump in the "boardroom" for an elaborate two-part elimination ceremony during which someone from that team is "fired" and therefore eliminated from the competition.[7] During the first phase of the boardroom ceremony, all of the members of the losing team are questioned by Mr. Trump and his two advisors regarding their performance on the task for that week. The project manager is then asked to pick two team members to bring back into the boardroom.[8] The project manager and two chosen contestants are then asked to wait outside the boardroom until summoned by Mr. Trump. The other members of the team are excused and allowed to return to the suite. After further discussion with his advisors outside the presence of the contestants, Mr. Trump asks Robin, his receptionist, to have the project manager and two chosen contestants return to the boardroom. During this second phase of the boardroom ceremony, the project manager and two contestants are asked additional questions by Mr. Trump and his advisors. Mr. Trump then makes the decision to eliminate one of the contestants from the game and tells that contestant "you're fired." All three of the contestants leave the boardroom, and the contestant who has been eliminated takes an elevator to the "street," while the other two contestants take a second elevator back to the suite to join the remaining contestants and continue with the "interview."

The same pattern is followed each week until only four contestants remain, at which time each of those four contestants is interviewed by four of Donald Trump's high level employees or executive level friends. At the conclusion of the interviews, the interviewers make their recommendations to Mr. Trump as to who he should fire. After considering the recommendations, Mr. Trump fires two of the four remaining contestants. The final two contestants then compete in a business task in which they are forced to lead a team of players who were previously fired. In the first season, one of the contestants was assigned to run the Chrysler Trump Golf Tournament at Mr. Trump's golf course in New York State, while the other contestant was in charge of a Jessica Simpson concert at Mr. Trump's Taj Mahal in Atlantic City. Donald Trump personally attends each of the final events, and then after a final boardroom with the two contestants during a live finale, Mr. Trump hires one of the two candidates as his apprentice.

---

[7] In the second season of The Apprentice, the project manager of the winning team is given a one time "immunity" or "exemption" from being fired in the event that his or her team loses the following week and ends up in the boardroom.

[8] In the second season, the project manager is given the choice to pick either two or three team members to return to the boardroom.

The Ninth Circuit has identified a process to be followed by the Court in applying the extrinsic test to the foregoing works. First, it is the Plaintiffs' burden to identify the sources of the alleged similarity between *C.E.O.* and *The Apprentice*. *See Apple Computer*, 35 F.3d at 1443; *see also Three Boys Music*, 212 F.3d at 485. In their Separate Statement of Additional Material Facts, Plaintiffs identify thirty-one alleged similarities between *C.E.O.* and *The Apprentice* which are listed and explained in the declaration of Plaintiffs' expert, Professor Richard Walter. See Plaintiffs' Separate Statement of Additional Material Facts ("SSAMF") at ¶¶ 168-198; Decl. of R. Walter at *passim*.[9]

Once Plaintiffs have identified the alleged similarities, "[u]sing analytic dissection, and, *if necessary*, expert testimony, the court must determine whether any of the allegedly similar features are protected by copyright." *See Apple Computer*, 35 F.3d at 1443 (emphasis added). The typical objective features to be compared when dissecting literary or dramatic works include plot, theme, dialogue, mood, pace, setting, characters, and sequence of events. *See, e.g., Kouf*, 16 F.3d at 1045. However, these features may vary depending on the type of works at issue, and may not be applicable in every case. *See id.; see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1177-78 (C.D. Cal. 2001). In comparing these features, the Court must first filter out any "unprotectable elements." *See, e.g., Apple Computer*, 35 F.3d at 1443. "Among the 'unprotectable elements' which the court must 'filter' out of its comparison of a copyrighted work and an allegedly infringing work are: 'ideas,' as distinguished from the 'expression' of those ideas; facts, historical events, or other information over which no individual is entitled to claim a monopoly . . .; elements borrowed from another author or from the 'public domain'; instances in which a particular 'expression' at issue 'merges' with the 'idea' being expressed; and/or a similar instance in which the form of the 'expression' is so 'standard' in the treatment of a given 'idea' that it constitutes a *scenes a faire*, or a 'scene which must be done.'" *Idema*, 162 F. Supp. 2d at 1176-77 (internal citations omitted).

At the most abstract level, or at the level of "ideas," there is some similarity between *C.E.O.* and *The Apprentice*. For example, Plaintiffs claim that the "plot" of both reality television programs is similar because both programs "depict a group of dynamic contestants from varied backgrounds competing in business challenges in a dynamic corporate environment for promotions and benefits and, ultimately, a real job as a top-level executive of a corporation." SSAMF at ¶ 179. However, Plaintiffs' alleged similarity is nothing more than a string of generic "ideas" which is not protected by copyright law. "[T]his degree of similarity between the basic plots of two works cannot sustain a plaintiff's claim that the works are 'substantially similar.' No one can own the basic idea for a story. General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985); *see also Litchfield*, 736 F.2d at 1357 ("Any similarities in plot exist only at the general level for which plaintiff cannot claim copyright protection."). "What is required is not just 'similarity,' but 'substantial similarity,' and it must be measured at the level of the concrete 'elements' of each work, rather than at the level of the basic 'idea,' or 'story' that it conveys." *Idema*, 162 F. Supp. 2d at 1179 (citing *Berkic*, 761 F.2d at 1293).

---

[9] Plaintiffs also identify a "non-exhaustive list" of fifteen similarities in their Opposition to Defendants' Motion which overlap those listed in their Separate Statement of Additional Material Facts. *See* Opposition to Defendants' Motion at 14-15.

Indeed, although the two works might appear similar at this level of abstraction, when Plaintiffs' expression of the foregoing plot ideas in *C.E.O.* is compared with the expression of those ideas in *The Apprentice*, it becomes evident that Plaintiffs' alleged similarities are, in fact, not similar at all.[10]  For example, the "business challenges" contemplated by Plaintiffs for *C.E.O.* involve normal tasks that would be performed by employees of a corporation and which relate to the development and growth of the start-up corporation.  Each challenge relates to a different facet of "running" the corporation, such as human resources, marketing, or accounting, with the corporation as the focus of the task.  In contrast, the "business challenges" used in *The Apprentice* are a series of separate and distinct tasks which do not relate to developing and running a start-up corporation.  Rather, the tasks typically involve testing the contestants ability to create a product and sell it for the greatest gain in a short period of time.

Contrary to Plaintiffs' allegations, the "promotions and benefits" received by the contestants on each program are also not similar.  In *C.E.O.*, contestants compete individually to earn points which result in promotions within the start-up corporation, as well as benefits such as improved living quarters, office space and meals.  Unlike *C.E.O.*, there are no "promotions" in *The Apprentice*.  The contestants remain equals throughout the competition, and the only change in status comes when a contestant is "fired," or in the final episode when one contestant is hired.  Additionally, the "benefits" received by the contestants on *The Apprentice* are not similar to those benefits received by the contestants on *C.E.O.*  The contestants on *The Apprentice* remain in the same suite in Trump Tower throughout the competition, and none of the contestants have office space because they are not employees of a corporation.  Although the team which wins a particular task may be rewarded with a single or one time extravagant meal at an expensive restaurant, all contestants, including those on the losing team each week, enjoy the same quality or type of meals in the suite throughout the week, unlike the contestants on *C.E.O.*

Plaintiffs' abstract comparison of the ultimate prize received by the contestants at the end of the competition is also a mischaracterization of the two works and a further example of a dissimilarity, not a similarity.  Plaintiffs claim that final prize in both programs is "a real job as a top-level executive of a corporation."  SSAMF at ¶ 179.  However, in *C.E.O.*, this idea is expressed as the individual with the most points at the conclusion of the program winning the position as the CEO of the start-up corporation that was created at the outset of the program and the development of which was the focus of the competition.  In contrast, the expression of that idea in *The Apprentice* is that the winner who is hired by Donald Trump will work as Mr. Trump's apprentice performing some executive level function in one of his over 100 companies.

The fact that each program generally seeks a "group of dynamic contestants from varied backgrounds" is not only not original to Plaintiff Bethea and *C.E.O.*, it is a staple of the reality television genre.  Such "stock elements" are not protectable and should not be considered in evaluating substantial similarity.  *See, e.g., Olson v. National Broadcasting Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988).  With respect to the concept of producing a reality television show set in the corporate environment, Plaintiffs' own counsel admitted during the hearing on June 20, 2005 that

---

[10] The Court recognizes that it cannot rely on an analysis or comparison of the dissimilarities between the two works in reaching its conclusion with respect to the extrinsic test.  However, the Court notes the dissimilarities in expression to highlight the fact that Plaintiffs' alleged similarities are not similarities at all.

this was nothing more than an "idea." Plaintiffs' counsel then argued that the specific expression of that idea is protectable. While that may be true, Plaintiffs have simply failed to provide the Court with any evidence of a specific expression of an idea which is similar in *C.E.O.* and *The Apprentice*. As the foregoing analysis demonstrates, although Plaintiffs are able to identify a number of similarities between the abstract ideas which form the basis for *C.E.O.* and *The Apprentice*, Plaintiffs, and notably their expert, have not and cannot identify similarities in the more concrete and protectable expressions between the two works.[11]

As a further example, Plaintiffs cite to the fact that the setting of *C.E.O.* and *The Apprentice* are similar because both "have a boardroom." SSAMF ¶ 175. However, one would expect to find a boardroom, (or as Plaintiffs' counsel abstracted even further at the hearing, a conference room), in any television program that is set in a corporate environment, irrespective of whether it is a reality program or a more typical scripted drama. The setting of a boardroom, by itself, constitutes nothing more than a classic example of *scenes a faire*. *See, e.g., Apple Computer*, 35 F.3d at 1444 (*Scenes a faire* are forms of expression which are "as a practical matter indispensable, or at least standard in the treatment of a given [idea]."); *Rice v. Fox Broadcasting Co.*, 148 F. Supp. 2d 1029, 1053 (C.D. Cal. 2001) ("Though what may constitute scenes a faire will vary depending on the medium and the subject matter of the particular copyrighted work at issue, the question is whether that particular expression is so typical of the genre (e.g., a car chase in an action film) as to be 'indispensable.'").

Moreover, when the specific expression of the idea, or how the boardroom is utilized in each of the works is compared, it is clear that any similarity can only be found in the abstract. In *The Apprentice*, the boardroom is the location where the contestants meet with Donald Trump at the end of each episode for an elaborate elimination ceremony, a common creative element of Defendant Burnett's reality television programs.[12] In *C.E.O.*, the only reference to a "boardroom" is a picture of a conference room on the final slide of the PowerPoint presentation. That same slide also has pictures of other stock items such as spacious hotel rooms, gourmet meals, and expensive cars. A picture of a conference room, without more, is simply not a protectable "expression" of an idea. Since the "boardroom" is not specifically expressed in Plaintiffs' work, Plaintiffs unsuccessfully attempt to draw similarity from the fact that *C.E.O.* contemplates that contestants will be evaluated by a "board of directors" in regularly scheduled board meetings. Specifically, Plaintiffs claim a similarity in the fact that both works "depict contestants' performance being evaluated by a group of professionals." SSAMF at ¶ 180. Like Plaintiffs' other alleged similarities, this is a similarity between the two works in the abstract, but the idea is expressed differently by each of the works.

---

[11] In light of Plaintiffs' expert's reliance on and analysis of numerous unprotectable similarities in his declaration, without providing a clear explanation of which similarities he believes are in fact protectable and unprotectable, the Court finds his testimony to be too general and subjective to be helpful to the Court in performing its analytic dissection of the two works. *See, e.g., Apple Computer*, 35 F.3d at 1442.

[12] At the end of episode of Defendant Burnett's reality television program *Survivor*, the team that lost the challenge that week meets at a specified location for an elaborate elimination ceremony known as "tribal council."

In *C.E.O.*, the "group of professionals" or "board of directors" is comprised of "real-life business leaders" and college professors. These individuals are responsible for scoring the contestants on an individual basis and awarding points that will determine who moves "up" and "down" the corporate "ladder." According to the treatment for *C.E.O.*, the board of directors "will, *collectively*, have the final say in all scoring and disputes and will resolve any and all ties." *C.E.O.* Treatment at 1 (emphasis added). Although certain contestants will be demoted based on their failure to earn as many points as the other contestants, none of the contestants are eliminated from the competition by the board of directors.

In contrast, there is no "board of directors" on *The Apprentice*. There is only one decision maker - Donald Trump. Although Mr. Trump may ask for advice from his advisors, such as Mr. Ross or Ms. Kepcher, regarding which contestant they think he should fire, he ultimately makes a subjective determination as to which contestant he wants to eliminate. The contestants are not individually scored. Rather, each week, only the team which lost the task for that week appears before Donald Trump to be questioned regarding their performance on that task. Based on which contestants the losing project manager chooses to bring back into the boardroom with him or her, Mr. Trump is limited in who he can "fire."

Plaintiffs also claim that the "characters" of both works are similar, and more specifically claim a similarity in the fact that "Donald Trump is the host of both 'C.E.O.' and 'The Apprentice.'" SSAMF at ¶ 169. As an initial matter, Plaintiffs cannot copyright the idea of having a well-known business leader, or even more specifically Donald Trump, host a reality television program. Additionally, Plaintiffs' concept for *C.E.O.* only suggests Mr. Trump as a possible host for their program. Plaintiffs also mention Chairman Iacocca as a possibility, or another host to be "selected for [his or her] past corporate experience as well as their on-screen presence and credibility." *C.E.O.* PowerPoint presentation at slides 24-25. Moreover, the proposed role that Mr. Trump would have in *C.E.O.* is very different from the role he has in *The Apprentice*. In *C.E.O.*, Mr. Trump would be host or "President" of the corporation, he would have day to day contact with the contestants and he would act as the contestants' liason with the board of directors. Mr. Trump would not be the decision maker, would not be involved in scoring the contestants, and his personal life and business activities would not be one of the major focal points of the program.

' In *The Apprentice*, Mr. Trump is more than just the host, he is the "star" of the program. A substantial portion of The Apprentice is devoted to providing the audience with insight into Mr. Trump's lifestyle, his business philosophy and the numerous companies that he operates as part of the "Trump Organization." Throughout the program, the audience is shown Mr. Trump's residence, his plane, his helicopter, Trump Tower in New York City, as well as his many other personal and business properties throughout the United States. Mr. Trump gives the viewers a piece of "business advice" every week which relates to a mistake that a contestant or team makes during the business challenge that week. Mr. Trump is the sole and final decision maker as to which contestant is eliminated each week, and at the conclusion of the program, who will work for him in one of his companies.

A number of Plaintiffs' other examples of alleged similarities are not original to Plaintiff Bethea or *C.E.O.* and are therefore not protectable. For example, the utilization of "specially constructed living spaces which maximize the social dynamics of groups living in the same quarters" is an element found in most reality television programs. SSAMF at ¶ 176. Indeed, Plaintiff admitted during his deposition that he did not create "the notion of all of the contestants

living together in an artificial environment" and had seen that done on other reality television programs such as *Big Brother, Survivor* and *The Real World* prior to creating *C.E.O.* Plaintiffs also include other unprotectable "staples" of the reality television genre in their list of alleged similarities, such as the fact that there is no scripted dialogue, there are incidental characters, and the production of an episode requires up to a week of action to be edited down to "approximately 44 minutes." See *id.* at ¶¶ 172, 196, 198. In some instances, Plaintiffs' alleged similarities blatantly mischaracterize the works. For example, Plaintiffs claim that both *C.E.O.* and *The Apprentice*, "begin with contestants being made part of a corporation." *Id.* at ¶ 182. This is simply not true. In *The Apprentice*, the contestants are divided into two teams and told to pick a name for their team which is referred to as a "corporation," but the "corporation" is a fiction and the name is used only to identify the team throughout the rest of the "interview." In *C.E.O.*, the contestants actually work together at a 9 to 5 job in a start-up corporation that is expected not only to function and grow as a real corporation, but to survive the conclusion of the program. The winner of the program is appointed CEO of that start-up corporation and is expected to continue to "run" the corporation long after the television program has ended.

Finally, Plaintiffs argue that, even if all of the similarities between the works are unprotectable when evaluated individually, the combination of unprotectable elements is protectable under the extrinsic test on the grounds that "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element." Opposition at 12-13 quoting *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002). However, the similarities to which Plaintiffs cite are random and have no concrete pattern or sequence in common. As the Ninth Circuit explained in *Rice v. Fox Broadcasting Company*:

> [H]ere we are not presented with the same pattern of generic similarities as in *Metcalf*. And even more important, our decision in *Metcalf* was based on a form of inverse ratio rule analysis: the plaintiff's case was "strengthened considerably by [defendants'] concession of access to their works." In *Metcalf*, the writer and producer of the allegedly infringing work conceded that they had read the plaintiff's work. Here, there is no such concession of access as most of [Plaintiff's] claims are based purely on speculation and inference. Because we are not confronted with the same totality of similarities and the same degree of access, this case is readily distinguishable from *Metcalf*.

*Rice v. Fox Broadcasting Company*, 330 F.3d 1170, 1179 (9th Cir. 2002); *see also Kouf*, 16 F.3d at 1045-46 ("[W]e are equally unimpressed by Kouf's 'compilation of "random similarities" scattered throughout the works.'"); *Litchfield*, 736 F.2d at 1356 (such a list of similarities is "inherently subjective and unreliable"). When taken separately or as a whole, the common elements of *C.E.O.* and *The Apprentice* simply do not allow for a reasonable inference that the works are substantially similar in expressive content.

### 3. Defendant Mark Burnett Independently Created *The Apprentice*

Defendants argue that even if the Court were to find that there are genuine issues of material fact with respect to the issues of access and substantial similarity, Defendants are still entitled to summary judgment on the grounds that Mark Burnett independently conceived of and created *The Apprentice* in late 2002 while in Brazil filming *Survivor: The Amazon*. Independent

creation is an affirmative defense to copyright infringement. "By establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying. The burden shifts to the defendant to rebut that presumption through proof of independent creation." *Three Boys Music*, 212 F.3d at 486.

In light of the Court's conclusion that there is insufficient similarity between *C.E.O.* and *The Apprentice* for Plaintiff to survive summary judgment, it is unnecessary for the Court to address Defendants' evidence of independent creation. However, assuming the Court had found sufficient evidence of access and substantial similarity to survive summary judgment, Defendants would nevertheless be entitled to summary judgment on the basis of independent creation.

In his declaration, Mark Burnett testifies that he first "came up with the initial concept for *The Apprentice* in late 2002 when [he] was in Brazil during filming of *Survivor: The Amazon*." Decl. of M. Burnett at ¶ 5. Mr. Burnett describes in great detail how the idea "germinated" after he watched a BBC documentary entitled *Trouble at the Top* "which dealt with people competing to win a job with a British businessman." *Id.* at ¶ 5. Defendant Burnett further explains that he immediately discussed his concept with a friend, Marlene Plomik, who he was staying with at the time. *Id.* at ¶ 9. The declaration of Ms. Plomik corroborates Mr. Burnett's testimony. In her declaration, Ms. Plomik states that she recalls watching a BBC program with Mr. Burnett in the Amazon "about several young British people attempting to win a job with a British businessman. The winner of the competition would win a high-level job with the corporation controlled by the businessman." Decl. of M. Plomik at ¶ 5. Ms. Plomik further states that although she "found the BBC show to be boring and dry" and "repeatedly asked Mr. Burnett to change the channel to something more interesting . . . Mr. Burnett was very interested in the show and refused to change the channel." *Id.* at ¶ 6. Ms. Plomik also remembers that Defendant Burnett told her that "he thought a television show including contestants competing against each other for a job, if done differently, would be very compelling television" and that "it would be an excellent concept to combine with concepts that he had developed on his show *Survivor*." *Id.* at ¶ 6.

Plaintiffs do not offer any evidence to dispute or otherwise contradict the testimony of Mr. Burnett or Ms. Plomik. Instead, Plaintiff claims that "Mark Burnett changed his "story" about his creation of 'The Apprentice.'" Opposition to Defendants' Motion at 20. Having reviewed Mr. Burnett's testimony during his deposition, the "bonus" footage contained on Disc 5 of the DVD's from the first season of *The Apprentice*, and the other evidence Plaintiffs' claim demonstrates that Mr. Burnett "changed" his story, the Court finds that Mr. Burnett's multiple descriptions in different forums of his creation of *The Apprentice* while he was in Brazil are entirely consistent with one another.

Plaintiffs also claim that the fact that Conrad Riggs was "involved in the creation of 'The Apprentice'" is evidence which creates a genuine issue of fact with respect to independent creation. *See id.* However, all of Plaintiffs' evidence regarding Mr. Riggs' alleged involvement in the creation of *The Apprentice* relates to events occurring in January of 2003, at least one month after Mr. Burnett first conceived of the idea for *The Apprentice*. Plaintiffs simply failed to provide the Court with any evidence which would refute Defendant Burnett's defense of independent creation.

For all of the foregoing reasons, Defendants' Motion for Summary Judgment as to Plaintiffs' First Claim for Relief is **GRANTED**.

B.  Defendants' Motion for Summary Judgment on Plaintiffs' Fourth Claim for Relief

Defendants move for summary judgment on Plaintiffs Fourth Claim for Relief for violation of California Business and Professions Code § 17200 on the grounds that it is preempted by the Copyright Act, 17 U.S.C. § 101 *et seq.* See Defendants' Motion at 25. "Under 17 U.S.C. § 301, States are expressly prohibited from legislating in the area of copyright law. In order for preemption to occur under the federal Copyright Act, two conditions must be satisfied. First, the content of the protected right must fall within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103. Second, the right asserted under state law must be equivalent to the exclusive rights contained in section 106 of the Copyright Act." *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003 (9th Cir. 2001).

"Preemption analysis involves determining whether the state law claim contains an element not shared by the federal law; an element which changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim." *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys.*, 7 F.3d 1434, 1439 (9th Cir. 1993) (internal quotations omitted). Under the first prong of the test, "[t]he work(s) upon which a state law claim is based need only be within the 'subject matter' of copyright; their actual *protection* thereunder is irrelevant to a preemption analysis," as "the shadow actually cast by the Act's preemption is notably broader than the wing of its protection." *Idema*, 162 F. Supp. 2d at 1189 (quoting *Endemol Entertainment B.V. v. Twentieth Television, Inc.*, 48 U.S.P.Q.2d 1524, 1526 (C.D. Cal. 1998)). With respect to the second prong of the analysis, "the court should engage in a fact-specific inquiry into the actual allegations underlying the claims as issue in the case, so as to determine whether the 'gravamen' of the state law claim asserted is the same as the rights protected by the Copyright Act." *Id.* at 1190.

In their Fourth Claim for Relief, Plaintiffs allege that Defendants violated Section 17200 by "using plaintiffs' ideas and work product without providing just compensation." Complaint at ¶ 55. Unfair competition claims based on allegations of misappropriation of intellectual property are preempted by the Copyright Act. *See, e.g., Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1213 (9th Cir. 1998).[13]

Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's Fourth Claim for Relief is **GRANTED**.

C.  Plaintiffs' Remaining State Law Claims For Relief

"The district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Once supplemental jurisdiction has been established under section 1367(a), the district court "can decline to assert supplemental jurisdiction over a pendant claim only if one of the four categories

---

[13] The Court notes that Plaintiffs failed to address Defendants' arguments or otherwise provide any support for their Section 17200 claim in their Opposition to Defendants' Motion. The Court construes Plaintiffs' failure to oppose, much less address, Defendants' arguments regarding preemption as a waiver of any opposition Plaintiffs may have to those arguments. *See, e.g., City of Arcadia v. E.P.A.*, 265 F. Supp. 2d 1142, 1154, n. 16 (N.D. Cal. 2003).

specifically enumerated in section 1367(c) applies." *Executive Software North America, Inc. v. U.S. Dist. Court for Cent. Dist. of California*, 24 F.3d 1545, 1555-56 (9th Cir. 1994).

The four bases to decline supplemental jurisdiction under § 1367(c) are: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates the claims over which the district court has original jurisdiction, (3) the district court dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." *Id.* at 1556.

This Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims for relief because the court has resolved all claims over which it had original jurisdiction. *See* 28 U.S.C. § 1367(c)(3). Additionally, the Court notes that Plaintiffs' remaining state law claims are virtually identical to claims alleged in an action currently pending in state court, and are therefore more appropriately resolved in that forum.

Accordingly, Plaintiffs' Second, Third and Fifth Claims for Relief are **DISMISSED without prejudice**.

## IV. Conclusion

For all of the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED in part** as to Plaintiffs' First and Fourth Claims for Relief.

Pursuant to 28 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over Plaintiffs' Second, Third and Fifth (state law) Claims for Relief and those claims are therefore **DISMISSED without prejudice**.

In light of the Court's dismissal of Plaintiff's Fifth Claim for Relief, the balance of Defendants' Motion for Summary Judgment is **DENIED as moot**.

In light of the Court's dismissal of Plaintiff's Second and Third Claims for Relief, Defendant Conrad Riggs' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment on Plaintiffs' Claims for Breach of Implied-In-Fact Contract (Second Claim for Relief) and Breach of Confidence (Third Claim for Relief) is **DENIED as moot**.

IT IS SO ORDERED.

The Clerk shall serve a copy of this Minute Order on all parties to this action.